IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| TARGET NATIONAL BANK/ TARGET VISA, | CIVIL DIVISION |
| Plaintiff | NO: AR07-009777 |
| vs. | |
| LIZ G. SAMANEZ, | |
| Defendant | |

*******************************************

| | |
|---|---|
| TARGET NATIONAL BANK, | NO. AR06-009418 |
| Plaintiff | |
| | OPINION AND ORDER OF COURT |
| vs. | |
| | HONORABLE R. STANTON WETTICK, JR. |
| JOHN R. CELESTI, | |
| Defendant | |

Counsel for Plaintiff:

Gregg L. Morris, Esquire
Patenaude & Felix
213 East Main Street
Carnegie, PA 15106

Defendant Liz G. Samanez, Pro Se:

Liz G. Samanez
320 Fort Duquesne Boulevard
Apartment 25E
Pittsburgh, PA 15222-1140

Counsel for Defendant John R. Celesti:

Thomas J. Dausch, Esquire
23 Brilliant Avenue
Pittsburgh, PA 15215

## OPINION AND ORDER OF COURT

WETTICK, A.J.

The subject of this Opinion and Order of Court is defendants' preliminary objections to plaintiffs' complaints raising noncompliance with the pleading requirements of Pa.R.C.P. 1019 because of the failure of plaintiffs to attach the monthly credit card statements upon which plaintiffs' claims are based, and plaintiffs' failure to attach writings that govern the defendants' obligations.

### I. *Target National Bank/Target Visa vs. Samanez*

The complaint filed by plaintiff ("Target") alleges that defendant opened an account with plaintiff for the purchase of goods and services. Plaintiff maintains accurate books of account, recording all credits and debits for this account. Defendant received monthly statements setting forth the nature and amount of all charges made by defendant. Defendant refuses to pay a balance due and owing of $8,215.84.

The only writing attached to plaintiff's complaint is a July 25, 2007 closing statement showing a previous balance of $8,180.84, late charges of $35.00, a new balance of $8,215.84, an amount past due of $1,814.34, and a minimum payment due of $8,215.84.

In *Worldwide Asset Purchasing, LLC v. Stern*, 153 P.L.J. 111 (2004), and in *FIA Card Services, N.A. v. Kirasic*, AR06-009360, ___ P.L.J. ___ (November 7, 2007), I

1

addressed preliminary objections to complaints to recover credit card balances based on a failure to attach the writings setting forth the terms and conditions of the credit card agreement and documents to support balances allegedly due.

In *Worldwide Asset Purchasing*, Bank of America was the issuer of the credit card and suit was brought by Worldwide Asset Purchasing. I ruled that Worldwide Asset Purchasing was required to attach to the complaint the written assignment or assignments that traced ownership of the account from Bank of America to Worldwide Asset Purchasing.

In *Worldwide Asset Purchasing*, the credit card companies filed complaints which attached only one monthly statement showing the balance allegedly due. I ruled that the complaints failed to comply with the requirements of Rule 1019 that a plaintiff shall (1) set forth the material facts upon which a cause of action is based and (2) attach the writings when a claim is based on a writing. I said that whenever a claim involves one period of time in which the initial terms and conditions of the credit card agreement apply and other periods of time in which amended terms and conditions apply, the plaintiff must attach to the complaint both the original and amended terms and conditions with the dates on which they are applicable.[1]

I also ruled that a complaint in which a plaintiff seeks recovery of a specific amount of money that is allegedly due must include documentation or allegations supporting recovery of this amount. I said that a complaint must contain sufficient documentation and allegations to permit a defendant to calculate the total amount of

---

[1] Most credit card agreements permit the issuer to change the terms and conditions of the cardholders' obligations regarding payment of interest, late fees, penalties, and costs and this is a common occurrence.

2

damages that are allegedly due by reading the documents attached to the complaint and the allegations in the complaint.[2]

In *FIA Card Services*, the plaintiff's initial complaint alleged that the defendant received monthly statements which accurately stated all purchases and payments made during the month, interest charges imposed on the unpaid balance, and the amount due. The complaint stated that as of November 9, 2006, the remaining balance was $22,061.86. The defendant filed preliminary objections based on my ruling in *Worldwide Asset Purchasing* that requires a credit card company to attach writings showing the terms and conditions of the applicable credit card agreement(s) and the applicable monthly statements which support the amount that is claimed. Card Services filed an amended complaint which attached the monthly statements upon which it based its claim for $22,061.86. However, it did not attach any writings showing the terms and conditions of the credit card agreements applicable to the defendant during the relevant times. Consequently, I sustained the defendant's preliminary objections to the amended complaint with leave to amend.

Card Services filed a second amended complaint which stated that it was unable to attach a copy of the applicable writings governing interest rates and fees during the relevant times. However, in the second amended complaint, Card Services only sought payment of the amount of the cash advances and purchases identified in the invoices attached to the complaint, less payments made to the plaintiff as set forth in the invoices.

---

[2] The material facts on which the cause of action is based include a listing of the cash advances, purchases, and charges that form the basis of the amount for which a judgment is sought. Those material facts may be pled by attaching the monthly invoices to the complaint.

3

Card Services attached to its second amended complaint a November 2004 statement showing a balance of $0.00 for the beginning of the billing cycle. Card Services also attached to the complaint the monthly statements from November 2004 through August 2006. The total amount of the cash advances and purchases shown on these statements, less the total amount of payments shown on these statements, was $16,251.99. In this lawsuit, this was the only money that Card Services sought to recover.

I overruled the defendant's preliminary objections, stating that while the plaintiff cannot produce the writings that govern the defendant's obligations during the period in question, the defendant does not dispute that the credit card that is the subject of this litigation was issued by the plaintiff to the defendant in 1990. A fact-finder may assume that any writing governing the defendant's obligations to the plaintiff between 1990 and August 2006 included the obligation to pay the cash advances and purchases shown on the invoices. Thus, the writings that the plaintiff cannot produce would be needed only to establish finance charges, late fees, over limit fees, and the like that the plaintiff may have been permitted to impose. However, the claim raised in the second amended complaint does not include any of these items. Consequently, the writings that the plaintiff attached to the second amended complaint supported the claim that the plaintiff is raising.

I stated:

> In summary, in consumer credit transactions, the Pennsylvania Rules of Civil Procedure require a credit card issuer seeking to recover money allegedly due to attach to the complaint the writings which support the claim which the credit card issuer is making. Invoices showing cash advances or purchases support a claim for payment of these items. *Id.* @*4.

In the present case, Target contends that my rulings in *Worldwide Asset Purchasing* and *FIA Card Services* do not apply. According to Target, this is a lawsuit to recover an account stated. Target has alleged that defendant received monthly statements and never raised any objections to the contents of the statements. Consequently, according to Target, she has agreed to pay the balance set forth in the final statement so any writings describing the relationship between the parties and the monthly charges and credits set forth in prior statements are irrelevant.[3]

The law recognizes a lawsuit based on an account stated where the complaint describes discussions between the parties or other back and forth communications as to the amount that is due. Once an agreement is made as to the amount that will resolve the dispute, this account stated constitutes a new and independent cause of action superseding any antecedent cause of action.

There may be situations in which a party's silence will be deemed to be an agreement to make payment of the amount set forth in a statement, in which instance it is not necessary for the creditor to introduce documents concerning the underlying

---

[3]At the argument on defendant's preliminary objections, counsel for Target, while contending that such writings are inapplicable and not relevant to a lawsuit to enforce an account stated, handed to me the monthly statements Target issued to plaintiff from October 25, 2005 through September 25, 2007. The November 25, 2005 statement begins with a $0.00 balance (i.e., it shows full payment of the previous balance of $265.40). Consequently, at a minimum, Target will be permitted to amend its complaint to attach these invoices and to seek recovery of the total amount of the cash advances and purchases shown on these statements less the total amount of payments shown on these statements. Furthermore, if Target, in an amended complaint, can attach writings that show the terms and conditions of the credit card agreements applicable to defendant during relevant times, plaintiff can also recover finance charges, late fees, and the like permitted under the agreements.

In this case, plaintiff is the issuer of the credit card. Consequently, this case does not involve the requirement imposed in *Worldwide Asset Purchasing* that the plaintiff attach writings to the complaint that trace ownership of the account from the issuer to the plaintiff.

transaction or documents supporting the amount of damages set forth in the statement. However, the failure to object cannot be construed as assent to pay the amount set forth in the statement unless the creditor can plead facts in addition to the failure to object to the invoice which show an express or implied agreement to pay the amount set forth in the invoice.

Traditionally, an account stated was a promise by a debtor to pay a stated account of money which the parties had expressly agreed upon. Watter H.E. Jaeger, 15 *Williston on Contracts* §1862 (3d ed. 1972). The doctrine was expanded to include an implied promise by the debtor to the creditor: "To establish an account stated there must be a contract between the parties, that is, an express or implied promise by the debtor to the creditor." *Id.* at 566 (footnote omitted).

*Black's Law Dictionary* 18 (8th ed. 2004) defines *account stated* as follows:

> A balance that parties to a transaction or settlement agree on, either expressly or by implication. The phrase also refers to the agreement itself or to the assent giving rise to the agreement.

*Standard Pennsylvania Practice (Second),* Action on account stated, describes an *account stated* as follows:

> An account stated is an account in writing, examined and accepted by both parties.
>
> **Observation:** An account stated is an agreement between parties to an open account; it includes a promise by the debtor, express or implied, to pay that balance.
>
> To produce an account stated, the account must be rendered, and the other party must accept, agree to, or acquiesce in the correctness of the account. 4 Standard Pennsylvania Practice 2d §22:17 at 303 (2001) (footnotes omitted).

6

The creation of an account stated is discussed in Contracts, Sections 512 and 513 of the *Pennsylvania Law Encyclopedia (Second)*. The relevant portions of the discussion are set forth below:

### § 512. —— General Considerations

An account stated has been defined as an account in writing, examined and expressly or impliedly accepted by both parties thereto, as distinguished from a simple claim or a mere summary of accounts.

In an action upon an account stated, it is not necessary to show the nature of the original transaction or indebtedness or to set forth the items entering into an account in the pleadings. However, in an action of enforcement of accounts stated, the plaintiff must prove there is an account in writing, examined and accepted by both parties, of which acceptance need not be expressly so, but may be implied from the circumstances. There must also be evidence of an acceptance, at least from the circumstances, by the defendant. 13 P.L.E.2d Contracts §512 at 9-10 (2001) (footnotes omitted).

### § 513. —— Assent of Parties as to Account

To produce an account stated, the account must be rendered, and the other party must accept, agree to, or acquiesce in the correctness of the account, under such circumstances as to import a promise of payment on the one side and acceptance on the other. In short, there must be a meeting of the minds, and there can be no account stated where the account rendered meets with general objection.

Acceptance or acquiescence need not be manifested expressly, but may be implied from the circumstances. Where the debtor has had an opportunity to scrutinize the account, his silence is prima facie evidence of acquiescence in an account stated, but the rule is otherwise if the debtor makes a timely objection.

Something more than mere acquiescence by failing to take exception to a series of statements of account received in the mail is required to create an account stated. 13 P.L.E.2d Contracts §513 at 11-12 (2001) (footnotes omitted).

7

I have reviewed the limited Pennsylvania case law discussing an action upon an account stated. The case law is accurately summarized in Sections 512 and 513 of the *Pennsylvania Law Encyclopedia*.

The opinions in the following cases appear to be the most recent Pennsylvania state court published opinions addressing the cause of action of an account stated: *Obermayer, Rebmann, Maxwell & Hippel v. Banta*, 28 Pa. D.&C.4th 225 (C.P. Phila. 1996), *aff'd in part, vacated in part,* 687 A.2d 866 (Pa. Super. 1996); *Rush's Service Center, Inc. v. Genareo*, 10 Pa. D.&C.4th 445 (C.P. Lawrence 1991); *C-E Glass v. Ryan*, 70 Pa. D.&C.2d 251 (C.P. Beaver 1975); and *Ryon v. Andershonis*, 42 Pa. D.&C.2d 86 (C.P. Schuylkill 1967).

In *Obermayer*, the Court stated that in the action of enforcement of accounts stated, the plaintiff must prove there is an account in writing examined and accepted by both parties. 28 Pa. D.&C.4th at 233. Acceptance by the defendant may be implied from the circumstances. *Id.* In this case, the Court found acceptance because the defendant expressed concern to the plaintiff about his ability to pay the fees recorded in the accounts. *Id.* at 233-34.

In *Rush's Service Center*, the Court stated that a complaint states a cause of action upon an account stated if it contains averments that there had been a running account, a balance remains due upon the account, the account has been rendered to the defendant, and the defendant has assented to the account. 10 Pa. D.&C.4th at 447. The Court overruled the defendant's preliminary objections because the complaint contained the necessary averments. *Id.* at 448. The opinion never described the

8

allegations in the complaint which would support a finding that the defendant assented to the account.

In *C-E Glass*, the plaintiff alleged that it sent statements each and every month. 70 Pa. D.&C.2d at 252. It attached to the complaint a monthly statement of account showing the amounts allegedly due for each of four invoices and a total balance due. It did not include information about the goods purchased or the amounts charged. The Court held that these allegations did not state a cause of action on an account stated because "something more than mere acquiescence by failure to take exception to a series of statements of accounts received in the mail is required." *Id.* at 253.

In *Ryon*, an insurance broker sued for insurance premiums. 42 Pa. D.&C.2d at 87. The complaint alleged that an account had been stated and the defendant has refused and neglected to pay the account. The Court ruled that these allegations did not set forth a cause of action on an account stated: "[m]utual assent to the correctness of the computation is essential to an account stated. Here, there is no allegation that defendant assented to the correctness of the account submitted to him." *Id*. at 88 (citations omitted).

According to this legal authority which I have described, there cannot be an account stated without evidence showing an agreement (express or implied) that the defendant owes the amount set forth in the account. Plaintiff's complaint does not include any factual allegations that would support a finding of an express or implied agreement that the cardholder will pay the amount set forth in the statement attached to plaintiff's complaint.

9

It appears to be plaintiff's position that a recipient of an invoice is estopped from requiring the party submitting the invoice to prove the accuracy of the amount claimed in the invoice unless the recipient has contested the accuracy of the invoice upon which plaintiff's complaint is based. Even if there are situations in which this position may have merit, it is without merit in credit card transactions because it is based on the assumption that the recipient, upon review of an invoice, can readily determine whether this is an amount that he or she owes.

This is not an accurate assumption in credit card transactions. Credit cardholders who do not pay the full amount of the new balance usually do not know whether any charges, other than the charges for purchases and cash withdrawals, are correct. It is reasonable to assume that most credit cardholders have never attempted to read the entire initial cardholder agreement. Furthermore, even if they attempted to do so, it is unlikely that they would fully understand what they have read. Also, most agreements provide that they can be amended upon fifteen days notice, and frequently the monthly statements are accompanied by amendments to the initial agreement that cannot be understood unless the credit cardholder has access to and does review the initial agreement, subsequent amendments, and the newest amendment. This does not occur.

In the present case, for example, the annual percentage rates in the monthly statements from October 25, 2005 through September 25, 2007 frequently differed from month-to-month. In January 2006, the annual percentage rate for purchases was 20.99%; in May 2006, the annual percentage rate for purchases was 21.74%; in August 2006, the annual percentage rate for purchases was 22.24%; in December 2006, the

10

annual percentage rate for purchases was 22.24%; and in March 2007, the annual percentage rate for purchases was 28.24%.

For several months, there was a late payment fee charge of $35.00.

While the credit cardholder, looking at the statement, can see the amount of the charges that were imposed, he or she is unlikely to know whether the charges are consistent with the writings governing the cardholder's obligations. Consequently, he or she is not in a position to either agree or disagree with the amount of the balance in any monthly statement that does not begin with a $0.00 balance.

The above description of the cardholder and issuer relationship is consistent with the findings in a September 2006 108-page report prepared by the United States Government Accountability Office titled *Credit Cards—Increased Complexity in Rates and Fees Heightens Need for More Effective Disclosures to Consumers*, www.gao.gov, Document GAO-06-929 (9/2006) (the "Report").

The portion of the Report titled *Results in Brief*, states that disclosures are too complicated for many consumers to understand. *Id.* at 4-6. In addition, the disclosures are often poorly organized, burying important information in the text, and scattering information about a single topic in numerous places. *Id.* at 6. The design of the disclosures often makes the disclosures hard to read with large amounts of the text in small, condensed typefaces and poor, ineffective headings. *Id.* at 6. The cardholder is not in a position to agree or disagree with the charges on a monthly statement that are unrelated to the cash withdrawals and purchases shown on the monthly statement because the obligations imposed on the cardholder are not easily understood.

Prior to 1990, most issuers charged a fixed interest rate and imposed few other charges. Thus, furnishing an adequate disclosure was relatively easy. Today, credit cards feature complex pricing structures. *Id.* at 13. Most cards now assess one interest rate on balances from the purchase of goods, another on balances that are transferred from another credit card, and a third on balances that result from using the card to obtain cash. Also, the cards usually provide for payments to be allocated first to the balance assessed at the lowest interest rate. *Id.* at 14-15, 27.

In addition to having separate rates for the different transactions, the cards increasingly impose interest rates that vary periodically as market interest rates change. Issuers typically establish these variable rates by taking the prevailing level of a base rate, such as the prime rate, and adding a fixed percentage amount. They frequently reset the interest rates on a monthly basis. *Id.* at 15.

Most credit cards provide for a penalty fee, described as a late fee, which issuers assess when they do not receive at least a minimum required payment by the due date. Most of the cards have a tiered fee structure depending upon the amount of the balance held by the cardholder (e.g., $15.00 late fee where the balances are between $100.00 and $250.00; $25.00 to $29.00 fee on accounts with balances up to $1,000.00; and $34.00 to $39.00 fee where the balance exceeds $1,000.00). *Id.* at 19-20.

Most issuers also assess cardholders a penalty fee for exceeding the credit limit, with the over limit fee also involving the use of a tiered structure. *Id.* at 20-21. Cards frequently have total credit limits at a lesser limit for cash. *Id.* at 22. Also, issuers do not reject purchases during the sale authorization even though the transaction puts the

cardholder over the card's credit limits, thereby exposing the cardholder to an over limit fee and a higher interest rate. *Id.* at 30.

Many cards provide for higher interest rates to be assessed if cardholders make late payments or exceed the credit limit. *Id.* at 24. Many cards also provide for increased rates when cardholders fail to make payments to other creditors. *Id.* at 24-25.

Most of the cards also provide for the cardholder to pay fees for certain services (e.g., 3% of cash advance amounts, 3% of transfer of a balance from another creditor, 3% of purchases made in a foreign country). *Id.* at 23.

The Report concluded that the disclosures which provide information about the costs and terms of using credit cards "had serious weaknesses that likely reduce their usefulness to consumers; . . . The disclosures . . . [were] written at a level too difficult for the average consumer to understand, and [had] design features, such as text placement and font sizes, that did not conform to guidance for creating easily readable documents. When attempting to use these disclosures, cardholders were often unable to identify key rates or terms and often failed to understand the information in [the] documents." *Id.* at 33.

The pricing structures depend upon the circumstances of the cardholder, and credit card disclosures are inadequate to inform cardholders as to the interest rates, fees, penalties, and other costs that may be imposed. The Report stated that the "disclosure documents were written such that understanding them required a higher reading level than that attained by many U.S. cardholders; . . . nearly half of the adult population in the United States reads at or below the eighth-grade level." *Id.* at 38. Accordingly, the Securities and Exchange Commission recommends that disclosure

13

materials be written at a sixth-to eighth-grade level. *Id.* Disclosures of credit card issuers on average were written "at a reading level commensurate with about a tenth-to twelfth-grade education." *Id.* at 37. An understanding of the disclosures in the solicitation letters would require "an eleventh-grade level of reading comprehension, while understanding the cardmember agreements would require about a twelfth-grade education. *Id.* In addition, certain portions of the typical disclosure documents required even higher reading levels to be understandable. For example, information about annual percentage rates, grace periods, balance computation, and payment allocation methods required "a minimum of a fifteenth-grade education, which is the equivalent of 3 years of college education." *Id.* at 38.

The Report described additional problems that also prevented cardholders from understanding the transactions, even assuming that the relevant documents were available. The disclosure documents do not use effective organizational structures and formatting. *Id.* at 38. The typical credit card disclosure lacks effective organization. *Id.* at 39. Many of the disclosure documents use font sizes that are difficult to read and thus hinder the consumer's ability to find information. *Id.* at 41. The typical disclosure documents are overly complex and present the relevant information in too much detail, "such as by using unfamiliar or complex terms to describe simple concepts." *Id.* at 46.

## CONCLUSION

It is the position of Target that in litigation instituted by an issuer to recover money allegedly due, a cardholder cannot question the correctness of the claim unless the cardholder previously questioned the correctness of the invoices upon which the

claim is based. If I were to accept Target's position, I would be creating a rule of law that imposes an obligation on the part of any person receiving an invoice to respond to the issuer of the invoice. There is no body of law which supports this position. If this were to become the law of Pennsylvania, every lawsuit to recover money allegedly due in which invoices were sent would include two counts—a breach of contract count and an account stated count based on the invoices that the plaintiff furnished the defendant.

The cause of action of an account stated is based on principles of contract law. There must be an express or implied agreement between the creditor and debtor that the debtor owes the amount set forth in the account. Where a complaint does not describe an express agreement, the complaint must include allegations which would support a finding that the cardholder has agreed that he or she owes the amount set forth in the writing. Plaintiff's complaint does not do so.

Cardholders do not know whether the finance charges, fees, penalties, and costs set forth in a monthly statement are permitted under the applicable credit card agreement. If cardholders cannot be expected to know whether the information in the monthly statement accurately states what they owe, there cannot be an express or implied agreement that their silence means that they have agreed that the amount claimed is correct.

For these reasons, I am sustaining defendant's preliminary objections.

II. *Target National Bank vs. Celesti*

The complaint filed in this case is virtually identical to the complaint filed in the prior action.

15

Target alleges that defendant opened an account for the purchase of goods and services. Defendant made or authorized a number of purchases and as of July 25, 2006, defendant owes $8,121.05 on the account. Plaintiff maintains accurate books of account recording all credits and debits. Defendant has received monthly statements and has failed to object to any of these statements. The only document attached to the complaint is a July 25, 2006 statement showing a previous balance of $8,086.05, a late payment fee of $35.00, and a new balance of $8,121.05.

Defendant has filed preliminary objections based on my Opinion in *Worldwide Asset Purchasing*. For the reasons that I sustained defendant's preliminary objections in the action at AR07-009777, I am sustaining defendant's preliminary objections to the complaint filed in this action.

For these reasons, I enter the following Order of Court:

16

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CIVIL DIVISION

TARGET NATIONAL BANK/
TARGET VISA,

    Plaintiff

vs.

LIZ G. SAMANEZ,

    Defendant

NO. AR07-009777

## ORDER OF COURT

On this __19__ day of December, 2007, it is hereby ORDERED that defendant's preliminary objections to plaintiff's complaint are sustained and plaintiff may file an amended complaint within thirty (30) days.

BY THE COURT:

_____
WETTICK, A.J.

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CIVIL DIVISION

| | |
|---|---|
| TARGET NATIONAL BANK, | |
| Plaintiff | |
| vs. | NO. AR06-009418 |
| JOHN R. CELESTI, | |
| Defendant | |

## ORDER OF COURT

On this __19__ day of December, 2007, it is hereby ORDERED that defendant's preliminary objections are sustained and within thirty (30) days plaintiff may file an amended complaint.

BY THE COURT:

_____
WETTICK, A.J.